| | | |
|---|---|---|
| | AUSA:   Claire Sobczak | Telephone:  (202) 591-5418 |
| AO 106 (Rev. 04/10)  Application for a Search Warrant | Special Agent:   Michael Wakeley | Telephone:  (313) 919-1435 |

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

| In the Matter of the Search of | ) | Case: 2:21-mc-50224 |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Judge: Lawson, David M. |
| INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 313-523-6789, THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE | ) ) ) ) | Case No.  Filed: 02-17-2021 At 09:29 AM IN RE: SEALED MATTER(SW)(MLW) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 & 1349 | Health Care Fraud & Conspiracy to Commit Health Care Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Wakeley, Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date:  February 17, 2021
_____
*Judge's signature*

City and state:  Detroit, Michigan

Hon. Anthony P. Patti       U. S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 313-523-6789, THAT IS STORED AT PREMISES CONTROLLED BY **T-MOBILE** | Case: 2:21-mc-50224 Judge: Lawson, David M. Case No. Filed: 02-17-2021 At 09:29 AM IN RE: SEALED MATTER(SW) (MLW) **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Wakeley, Special Agent for the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number 313-523-6789 ("Subject Phone") that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way Parsippany, NJ 07054.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of

Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such, and have been employed as such since August 2016. I am currently assigned to the Detroit division of the FBI and my duties include investigating health care fraud and prescription drug diversion.

3.      I have received general law enforcement training at the FBI Academy, specific training on prescription drug diversion and healthcare fraud from the FBI, DEA, and other agencies, and have been personally involved in investigations concerning health care fraud, prescription drug diversion and methods used to finance and conceal the profits of those operations. I am familiar with the Medicare program, as well as the federal healthcare fraud and narcotics trafficking laws. I have also received training from the FBI Cellular Analysis Survey Team on the content and analysis of cellular telephone location data, and currently hold a Global Information Assurance Certification in information security.

4.      As an FBI Special Agent, I am responsible for investigating violations of United States federal law, including, but not limited to, Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1349 (Conspiracy to

2

Commit Health Care Fraud and Wire Fraud); Title 42, United States Code, Section

1320a-7b(b) (Illegal Remunerations); Title 18, United States Code, Section 371

(Conspiracy to Pay or Receive Illegal Remunerations); Title 21, United States

Code, Section 841 (Unlawful Distribution of a Controlled Substance); Title 21,

United States Code, Section 846 (Conspiracy); and other violations. In connection

with investigating these offenses, I have participated in the execution of search

warrants for documents, electronic data and devices, and other evidence in cases

involving violations of these offenses, including at medical facilities, such as

medical clinics and pharmacies, individuals' residences, and at locations storing

electronic records.

     5.     The facts in this affidavit come from my personal observations, my

training and experience, and information obtained from other agents and witnesses.

This affidavit is intended to show merely that there is sufficient probable cause for

the requested warrant and does not set forth all my knowledge about this matter.

     6.     Based on the facts set forth in this affidavit, there is probable cause to

believe that violations of 18 U.S.C. §§ 371, 1320a-7b(b), 1343, 1347, and 1349

and 21 U.S.C. §§ 841 and 846 have been committed, are being committed, and will

be committed by Abe Saad ("Saad") and other co-conspirators.  There is also

probable cause to search the information described in Attachment A for evidence

and fruits of these crimes as further described in Attachment B.

## **VIOLATION STATUTES**

7.     Title 18, United States Code, Section 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

8.     Title 18, United States Code, Section 1343, prohibits wire fraud: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

4

9.     Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those set forth in 18 U.S.C. §§ 1347 and 1343.

10.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

11.     Title 42, United States Code, Section 1320a-7b(b)(2)(A), prohibits knowingly and willfully offering and paying any remuneration (including any kickback, bribe, or rebate) in return for referring an individual to a person for the furnishing or arranging of any item or service for which payment may be made in whole or part by a federal health care benefits program as defined by 18 U.S.C. § 24(b).

12.     Title 42, United States Code, Section 1320a-7b(b)(1)(A), prohibits knowingly and willfully soliciting and receiving any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part by a federal health benefits program as defined by 18 U.S.C.§ 24(b).

13.     Title 18, United States Code, Section 371, prohibits conspiring to commit any offense against the United States, or to defraud the United States, or any agency thereof.

14.     Title 21, United States Code, Section 841(a)(1), provides that it is unlawful for any person to knowingly or intentionally manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

## THE MEDICARE AND MEDICAID PROGRAMS

15.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are sixty-five years of age or older or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services ("HHS"). Individuals who receive Medicare benefits are Medicare "beneficiaries."

16.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

17.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical

6

equipment and supplies, and other health services and supplies not paid by Part A. This investigation involves Medicare Part D, prescription drug benefits.

18.    A pharmacy can participate in Medicare Part D by entering into a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers ("PBMs"). A PBM acts on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy can join the plan's network. When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the plan or to a PBM that represents the beneficiary's Medicare drug plan. The plan or PBM determines whether the pharmacy is entitled to payment for each claim and periodically pays the pharmacy for outstanding claims. The drug plan's sponsor reimburses the PBM for its payments to the pharmacy. PBMs sometimes contract with Pharmacy Services Administrative Organizations ("PSAOs") to administer some of its services, such as payments.

19.    CVS Caremark, OptumRx, and Express Scripts are three of several PBMs. CVS Caremark processes and adjudicates claims electronically in Arizona. OptumRx and Express Scripts process and adjudicate claims electronically outside the state of Michigan.

20.    Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the

sponsors' plans. Such payments are called capitation fees. The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

21.     By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

22.     Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for a period of at least six years.

23.     Qlarant is the Medicare Part C and Part D program integrity contractor for CMS under the National Benefit Integrity Medicare Drug Integrity Contract ("MEDIC"). Qlarant's role is to detect, prevent, and investigate allegations of fraud, waste, and abuse in the Part C (Medicare Advantage

organizations) and Part D (prescription drug coverage) programs on a national level.

24.     The Michigan Medicaid Program ("Medicaid") is a federal and state funded health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements and certain other individuals who lack adequate resources to pay for medical care. CMS is responsible for overseeing the Medicaid program in participating states, including Michigan. Individuals who receive benefits under the Medicaid program are also referred to as "beneficiaries."

25.     Medicaid covers the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid are reimbursements to pharmacies for the provision of prescription drugs. Generally, Medicaid covers these costs if, among other requirements, they are medically necessary and ordered by a physician.

## BLUE CROSS BLUE SHIELD OF MICHIGAN

26.     Blue Cross and Blue Shield of Michigan ("BCBS") was a nonprofit, privately operated insurance company authorized and licensed to do business in the state of Michigan.  BCBS provided health care benefits, including prescription

drug benefits, to member entities and individuals.  Individuals insured by BCBS were referred to as BCBS "members."

27.    BCBS had agreements with participating providers, including pharmacies, to furnish medical services to BCBS members.

28.    BCBS was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

## FRAUD SCHEME

29.    A common pharmacy fraud scheme is to bill Medicare, Medicaid, and other health insurers for medication that the pharmacy does not actually dispense to patients. Put another way, at a high-level, the pharmacy is submitting a higher volume of medication in claims to Medicare, Medicaid, and other insurers than it purchased during the relevant period; based on my experience and training, this is often referred to as a "shortage" scheme. This is indicative of fraud because a pharmacy cannot dispense more medications than it has purchased. Typically, although not always, Medicare and Medicaid pay significant sums for these "shortage" medications. For example, inhalers and pain creams are common shortage medications because insurers may pay hundreds of dollars for those medications. However, pharmacies can bill but not dispense any medication. Over the course of approximately the last four years, I and other agents with whom I work have investigated shortage schemes and interviewed many patients who have

10

told us that both expensive and inexpensive medications (ranging from inhalers like Advair, Symbicort, QVAR, Spiriva, and HIV medication to creams and other items) were billed to Medicare, Medicaid, and other insurers that they never received from a particular pharmacy.

30.    I will provide a simplified overview of how the shortage analysis is conducted to assist the Court in evaluating this search warrant application. In general, investigating a shortage scheme involves three steps: first, agents obtain a pharmacy's drug purchase records from pharmaceutical wholesalers. Agents identify wholesalers based on financial records for the pharmacy and its owner, which identify purchases from wholesalers, and submissions from the pharmacy to state regulators and PBMs about the wholesalers used by the pharmacies; second, agents obtain Medicare and Medicaid claims data for the pharmacy; third, agents request that Qlarant conduct a shortage analysis for the time period for which it has drug purchase records and claims data.

31.    Using the pharmacy's purchase records from the wholesalers and the claims data, Qlarant will pick a representative sample of prescription medications and compare the volume purchased with the volume dispensed in Medicare and Medicaid claims. Qlarant will then identify the volume of any shortage for each medication reviewed and the estimated amount that Medicare and Medicaid would have paid for medication billed but not dispensed. Because this analysis generally

11

does not include claims data from any private insurers, the shortage amounts are conservative numbers because they do not incorporate any claims for that medication billed to private insurers.[1]

32.    Based on the shortage analyses performed in this investigation, the subject pharmacy Maya Pharmacy, LLC ("Maya") fraudulently billed Medicare, Medicaid, and other insurers for medications that were not dispensed to beneficiaries. The pharmacy did not have sufficient drug inventory to dispense numerous expensive medications billed to Medicare and Medicaid.

33.    Pharmacies will also submit claims for medications disbursed to patients that post-date the date the patient died. Often, this is because the pharmacy has an automatic refill system in place that sends a claim to Medicare, Medicaid, and other insurers after a certain time period has passed since the prior fill of that prescription. However, whether a prescription is an automatic refill or not, if a patient does not pick up a prescription, the pharmacy is obligated to reverse the claim within a certain time. In my training and experience, pharmacies committing fraud often submit claims for beneficiaries who are already dead and never reverse them. The pharmacy involved in this investigation submitted post-death claims.

---

[1] However, because Blue Cross Blue Shield ("BCBS") is a major health insurance company in Michigan, once Qlarant determines which medications were short, BCBS is often asked to provide the sum that it paid on claims that pharmacy submitted for the shortage medications.

34.     Abe Saad, the owner/operator of the aforementioned pharmacy, is believed to have submitted or caused to be submitted false and fraudulent claims through interstate wires from Michigan to Medicare, Medicaid, and other insurers. The claims were processed and adjudicated electronically by CVS Caremark, OptumRx, and Express Scripts, among other PBMs, outside the state of Michigan.

## SUBJECT PHARMACIES

### Maya Pharmacy

35.     Maya is a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"). The following information is based on publicly available documents filed with LARA on Maya's behalf. Maya was organized on February 27, 2012. According to the Articles of Organization, Saad was listed as the resident agent. Maya's most recent annual report (2016) listed Saad as the resident agent and the address as 15400 Michigan Avenue, Dearborn, MI 48125.

36.     According to March 2015 and September 2017 provider certifications that Maya provided to Express Scripts, a PBM, the practice address for Maya is 15400 Michigan Ave., Dearborn, MI, since approximately 2012. The provider certifications listed Saad as the 100% owner and authorized signatory.

37.     On November 2, 2020, agents received correspondence that Saad sent to LARA regarding Maya, which was dated May 27, 2019.  The letter was written

13

to the Michigan Board of Pharmacy and stated that Maya was going out of business, with an effective closing date of June 12, 2019. The letter stated all records and prescription files from Maya would be stored in a storage room at 15400 Michigan Ave., Dearborn, MI, the previous operating location of Maya.

### Allen Park Discount Pharmacy

38.    Rx Discount Pharmacy d/b/a Allen Park Discount Pharmacy ("Allen Park") is a registered business entity with LARA. The following information is based on publicly available documents filed with LARA on Allen Park's behalf. Allen Park was organized on November 20, 2012 under the name Rx Discount Pharmacy, LLC. According to the Articles of Organization, Saad was listed as the resident agent and registered office address was 6811 Allen Road, Allen Park, MI 48101. On November 27, 2012 and August 8, 2018, Certificates of Assumed Name were filed with LARA, which were signed by Saad. The assumed name for each was Allen Park Discount Pharmacy and the most recent filing expires at the end of 2023. Allen Park's most recent annual report from 2019 listed Saad as the resident agent and the mailing address for the registered office as 5430 Horger, Dearborn, MI 48126.

39.    According to March 2015 and September 2017 provider certifications that Allen Park provided to Express Scripts, a PBM, the practice address for Allen Park was 6811 Allen Road, Allen Park, MI 48101 since approximately 2013. The

14

provider certifications listed Saad as the 100% owner and authorized signatory.

40.     I went to Allen Park on January 29, 2021, and the pharmacy was still in operation at that time.

## PROBABLE CAUSE

### Pharmacy Fraud Scheme at Maya

41.     In 2016, the Michigan Department of Health and Human Services—Office of Inspector General ("MDHHS-OIG") conducted an invoice review of Maya for the period January 1, 2012, through February 29, 2016. MDHHS-OIG's invoice review compared Maya's drug purchases to its Medicaid billing for this period. MDHHS-OIG determined that Maya had a shortage of a number of medications that resulted in a loss to Medicaid of $498,458.61. MDHHS-OIG typically reviews only claims submitted to Medicaid and not to Medicare.

### Qlarant Invoice Reconciliation for Maya

42.     During the MDHHS-OIG invoice review, Maya supplied MDHHS-OIG with the names of pharmaceutical wholesalers from which it had purchased its inventory of medications. MDHHS-OIG provided me with Maya's drug purchase records utilized in its invoice review of Maya for the above-stated period. The records provided by MDHHS-OIG contained drug sale or purchase records from the pharmaceutical wholesalers that are listed below.

43.     I furnished all of the wholesaler records and Medicare and Medicaid

15

data that I received to Qlarant and requested an invoice review for the period supported by drug purchase invoices from August 2, 2012 to February 28, 2016. Qlarant compared invoices for Maya's drug purchases to Medicare and Medicaid claims data for this period.

44.     On February 2, 2021,[2] Qlarant provided the following summary of its invoice review:

**Wholesalers with Supportive Invoices:** Auburn, Global, Harvard, Intermed, McKesson, and ParMed/Gensource

**Date Range of Invoice Review:** 8/2/2012 – 2/28/2016

**Number of Drugs Reviewed:** 1,512

**Number of Drugs with Shortages:** 759

**Approximate Loss to Medicare:** $1,299,801.53

**Approximate Loss to Medicaid:** $359,028.43

**Approximate Combined Loss to Medicare and Medicaid:** $1,658,829.97

45.     Based on the analyses of Qlarant, agents created the following summary for Maya's top-ten drug shortages by approximate overall dollar loss to federal health care programs.

---

[2] Qlarant provided its initial invoice review summary for Maya on July 30, 2018.  That summary included an analysis of the top 60% of medications that Maya had billed to Medicare and Medicaid.  Qlarant's updated invoice review from February 2021 includes an analysis of 100% of the medications that Maya billed to Medicare and Medicaid.

| NDC | FDB Description | Approximate Dollar Loss-Overall |
|---|---|---|
| 50383093355 | LIDOCAINE 5% OINTMENT | $290,440.50 |
| 59148000813 | ABILIFY 10 MG TABLET | $109,176.30 |
| 00597007541 | SPIRIVA 18 MCG CP-HANDIHALER | $79,478.40 |
| 00088221905 | LANTUS SOLOSTAR 100 UNIT/ML | $59,678.22 |
| 00310028360 | SEROQUEL XR 300 MG TABLET | $51,678.90 |
| 00169633910 | NOVOLOG 100 UNIT/ML FLEXPEN | $45,834.30 |
| 00173069600 | ADVAIR 250-50 DISKUS | $36,525.00 |
| 59148001113 | ABILIFY 30 MG TABLET | $35,873.40 |
| 59310057922 | PROAIR HFA 90 MCG INHALER | $35,682.52 |
| 59148000913 | ABILIFY 15 MG TABLET | $34,142.40 |

46.     In sum, Qlarant concluded that Maya's inventory of prescription drugs was not sufficient to support its claim submissions to Medicare and Medicaid for at least 759 of the 1,512 drugs selected for the analysis. Based upon the shortage detected, Qlarant concluded that Medicare and Medicaid paid Maya approximately $1,658,829.97 for medications that Maya did not have sufficient inventory to dispense. The shortage drugs that caused the highest dollar loss were Lidocaine Oin 5%, Abilify Tab 10mg, and Spiriva Cap Handihaler.

**BCBS Shortage at Maya**

47.     On August 24, 2018, based on the Medicare and Medicaid shortage medications initially identified by Qlarant in July 2018, BCBS provided a financial

17

impact letter indicating that BCBS paid $244,071.67 in claims submitted by Maya for those shortage medications over the same period as Qlarant's analysis.

## Billing for Deceased Beneficiaries at Maya

48. Agents conducted a review of the Medicare Part D claims data and Medicaid claims data for Maya, which revealed that Maya billed for medication purportedly dispensed to beneficiaries after they were deceased. Between approximately March 2014 and March 2015, Maya submitted seven claims for medications purportedly dispensed to beneficiaries after their dates of death.

## Maya Claims Submission Post MDHHS-Audit

49. The invoice review for Maya was conducted matching the same period as the Medicaid audit performed by MDHHS-OIG. The audit period and invoice review ended on February 29, 2016; however, the pharmacy remained operational and submitted claims to Medicare and Medicaid until June 2019.

## Dr. Tete Oniango

50. On August 19, 2020, Dr. Tete Oniango ("Oniango") was charged by indictment by a federal Grand Jury in the Eastern District of Michigan with Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Case No. 2:20-cr-20366). The indictment alleges that Dr. Oniango conspired with others to knowingly, intentionally, and unlawfully possess with the intent to distribute controlled substances, including but not limited to the

Schedule II drug hydrocodone acetaminophen and the Schedule IV drugs Carisoprodol (Soma®) and Alprazolam (Xanax®), from approximately January 2014 to June 6, 2017. During that timeframe, many of the controlled substance prescriptions and accompanying non-controlled prescriptions issued by Dr. Oniango were reportedly dispensed at Maya.

## **Maya Beneficiary Interviews**

51.     FBI agents interviewed C.J., a Medicaid beneficiary who picked up prescriptions at Maya in early 2015. C.J. stated that s/he was recruited by an individual ("W.A.") in August 2014 to obtain controlled substances prescriptions through Dr. Oniango and then have those prescriptions filled at Maya. C.J. stated that his/her appointment with Dr. Oniango lasted for approximately 10 minutes, and no real examination was performed during that visit. C.J. believed Dr. Oniango already knew which prescriptions he was going to write for C.J. After seeing Dr. Oniango, C.J. filled his/her prescriptions at Maya and gave the drugs to W.A. In exchange for filling these prescriptions at Maya, W.A. paid C.J. $200.

52.     Claims data reflects that Dr. Oniango prescribed medications to C.J. that were purportedly filled at Maya between August 2014 and May 2016. C.J. identified Saad as working at Maya when s/he went to Maya to fill his/her prescriptions. C.J. stated that s/he did not receive all of the medication that Maya billed to his/her Medicaid insurance.

19

53.     C.J. stated that s/he went to Maya only in early 2015 and did not continue to go to Maya through May 2016 despite C.J.'s Medicaid insurance being billed on five occasions in 2016. C.J. stated that s/he did not receive any of the medications prescribed by Dr. Oniango and billed by Maya to his/her Medicaid insurance in 2016.

54.     C.J. stated that s/he never received Latuda or Seroquel from Maya, even though the claims data showed that Maya billed C.J.'s Medicaid insurance 11 times for Latuda and 14 times for Seroquel between April 4, 2015 and May 5, 2016.  In total, Maya billed Medicaid $12,335.00 and was paid $9,823.13 for C.J.'s Latuda prescriptions during this timeframe. Moreover, Maya billed Medicaid $19,045.30 and was paid $15,868.40 for C.J.'s Seroquel prescriptions during this timeframe.  Seroquel was one of the shortage medications identified in Qlarant's invoice reconciliation analysis.

55.     Agents also interviewed J.G, a Medicaid beneficiary who picked up prescriptions at Maya in 2014 and 2015.  Claims data reflects that J.G. purportedly received prescriptions through Maya from August 2014 to June 2016, all of which were prescribed by Dr. Oniango.  J.G. stated that s/he was introduced to Dr. Oniango through W.A., and that W.A. paid J.G. between $200 and $400 to see Dr. Oniango.  Dr. Oniango then directed J.G. to fill all of these prescriptions at Maya, beginning with those that Dr. Oniango prescribed in August 2014.

56.     J.G. stated that the only medications that s/he received from Maya were Norco, Soma, and Xanax.  J.G. stated that s/he never received Latuda or Seroquel from Maya, even though J.G.'s claims data showed that Maya billed Medicaid nine times for Latuda and eight times for Seroquel between May 8, 2015 and January 4, 2016.  In total, Maya billed Medicaid $10,436.00 and was paid $8,627.56 for J.G.'s Latuda prescriptions during this timeframe.  Moreover, Maya billed Medicaid $9,383.20 and was paid $8,144.85 for J.G.'s Seroquel prescriptions during this timeframe.  J.G. stated that he could not have picked up the Latuda or Seroquel prescriptions that were purportedly filled on January 4, 2016, because s/he had reported to prison the day beforehand to serve time for a parole violation.  Seroquel was one of the shortage medications identified in Qlarant's invoice reconciliation analysis.

57.     J.G. identified Saad as an employee at Maya who always worked behind the counter there.  J.G. stated that Saad was the person at Maya who knew W.A. and worked with W.A.

## Subject Phone

58.     Agents received subscriber information for the Subject Phone from T-Mobile on February 5, 2021. The subscriber information listed Maya Pharmacy/Abe Saad as the subscriber to the Subject Phone number, with service beginning on June 8, 2015, and continuing through at least January 28, 2021.

Agents made telephone contact at the Subject Phone number with an individual who identified himself as Abe Saad on January 5, 2021, January 8, 2021, January 27, 2021, and January 28, 2021.

## Location of Maya Records

59.     In order to ascertain the location of Maya's records, an HHS-OIG agent and I requested Maya prescription records from Saad on two occasions in January 2021.  The HHS-OIG agent first contacted Saad telephonically at the Subject Phone number on January 5, 2021.  During this call, the HHS-OIG agent notified Saad that agents had a request for prescription records that had been prescribed by Dr. Oniango and filled at Maya between 2015 and 2016.  Saad stated that Maya had closed approximately two years ago.  He stated that he was aware that Maya's records had to be retained for seven to ten years and that the prescriptions from Maya were organized by year and could be located by prescription number.  Saad stated that either he or an employee at Allen Park ("E-1") would meet the agents at Allen Park, where Saad stated Maya's records were currently kept.

60.     On January 7, 2021, the HHS-OIG agent and I went to Allen Park and served E-1 with the request for 12 medications prescribed by Dr. Oniango that were purportedly filled at Maya between April 1, 2016, and May 9, 2016.  E-1 then went into a back room at Allen Park and returned with two bundles of Maya paper

22

prescription records.   E-1 looked through the bundles of Maya's prescription records to locate the 12 specific prescriptions requested by agents, but E-1 was unable to locate the records for those 12 prescriptions in the bundles.   E-1 again went to the back of Allen Park to locate the requested records.   When E-1 returned, E-1 stated that the specific prescriptions the agents were seeking were not at Allen Park, but rather were in storage and that s/he needed the key to unlock the storage where the Maya records were kept. E-1 did not tell agents where the records were stored.   Saad was not present during this meeting and E-1 stated that he was not at Allen Park.   E-1 also said that s/he had called Saad and left him a message about locating these records. T-Mobile toll records for the Subject Phone confirm that a telephone number associated with E-1 in a utility and credit reporting database was in contact with the Subject Phone while the agents were at Allen Park.

61.    Approximately three hours after the HHS-OIG agent and I left Allen Park on January 7, 2021, Saad called the HHS-OIG agent telephonically from the Subject Phone. Saad stated that he had located the records for the 12 requested prescriptions and had placed them in an envelope at Allen Park for the agents to pick up.

62.    On January 8, 2021, the HHS-OIG agent and I returned to Allen Park to pick up the requested Maya prescriptions.   The requested Maya prescriptions were provided to me by another employee ("E-2") of Allen Park.   E-2 told agents

to contact Saad for any future prescription requests.  E-2 stated that Maya's records were not stored at Allen Park and Saad knew where they were located.

63.    On January 27, 2021, the HHS-OIG agent spoke telephonically with Saad at the Subject Phone and requested 12 additional prescriptions that were prescribed by Dr. Oniango and purportedly filled at Maya between June 27, 2014, and October 27, 2015.  Agents served Saad with this written request via email on January 27, 2021.  Agents were conducting surveillance on Saad at the time he was served with this second request.

64.    At approximately 11:32 a.m. on January 28, 2021, the HHS-OIG agent received a missed call from the Subject Phone.  Following this telephone call, FBI surveillance agents observed Saad leave his residence at 4671 Firestone Street, Dearborn, MI ("Firestone"), and drive to a residence at 5430 Horger Street, Dearborn, MI ("Horger").  Agents observed Saad walk into the Horger house. Saad exited the Horger house and then drove to Allen Park.  According to a review of LARA business filings, Horger has been listed as the registered office mailing address for several businesses registered to Saad, including Allen Park.

65.    At approximately 12:28 p.m. on January 28, 2021, the HHS-OIG agent spoke to Saad telephonically at the Subject Phone.  Saad stated that the prescriptions were ready for pick-up at Allen Park.  Surveillance agents confirmed that Saad had left Allen Park several minutes before this call.  The HHS-OIG agent

24

and I retrieved this second production of requested Maya records from Allen Park the following day.

66.     Based on the above documentation, events, and conversations with Saad and Allen Park employees, it is unclear whether Maya records are being stored at Allen Park or somewhere else.  Saad's filing with the state of Michigan listed 15400 Michigan Avenue—Maya's business address while it was operational—as the storage location.  In contrast, Saad told agents twice that Maya's records were stored at Allen Park, while E-1 did not tell agents where the records were located, other than that they were in storage, and E-2 said Maya's records were not at Allen Park.  Saad's movements on January 28, 2021, indicated he could have retrieved the requested Maya prescriptions from his Firestone residence, the Horger residence, or Allen Park.  In any event, it seems that Saad knows where the records are located and accessed them between January 5, 2021, and January 8, 2021, and again on either January 27 or 28, 2021, in order to respond to the agents' two requests for Maya prescription information.  Cell phone location data will assist agents in determining possible locations where Saad may have gone to retrieve the Maya records. These records are needed to establish whether and to what extent fraudulent billing occurred at Maya.

25

## T-MOBILE RECORDS

67.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

68.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the Subject Phone.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular

phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

69.    Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Subject Phone's user or users and may assist in the identification of co-conspirators and/or victims.

## **CONCLUSION**

70.    Based on the forgoing, I submit that this affidavit sets forth sufficient facts to believe that in Oakland County in the Eastern District of Michigan and elsewhere, Abe Saad and others, known and unknown, violated Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, Section 1343 (Wire

Fraud); Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and/or Wire Fraud); Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States); and Title 42, United States Code, Section 1320a-7b (Soliciting and Receiving Kickbacks Involving a Federal Health Care Program); Title 21, United States Code, Section 841 (Unlawful Distribution of a Controlled Substance); Title 21, United States Code, Section 846 (Conspiracy). I further submit that there is probable cause to believe that evidence, fruits and instrumentalities of these crimes, as described above and in Attachment B, will be located in the information associated with the Subject Phone maintained by T-Mobile.

## AUTHORIZATION REQUEST

71.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

72.     I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

28

73.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

Michael Wakeley, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my
Presence and/or by reliable electronic means,

Hon. Anthony P. Patti   February 17, 2021
United States Magistrate Judge

29

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **313-523-6789**, ("the Account"), that are stored at premises controlled by **T-Mobile USA, Inc.** ("the Provider"), headquartered at **4 Sylvan Way, Parsippany, New Jersey 07054.**

## ATTACHMENT B

### Particular Things to be Seized

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time periods **January 5, 2021, through January 8, 2021, and January 27, 2021, through January 28, 2021**:

    a. The following subscriber and extended subscriber information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.  Length of service (including start date) and types of service utilized;

    vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"); device make and model;

    vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

    i.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers); call detail records for voice, SMS, MMS, and data; email addresses and IP addresses; and

    ii.  information regarding the cell towers and sectors through which the communications were sent and received; and

3

iii.   per call measurement and timing advance data (PCMD, RTT, True Call, or similar)

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371, 1320a-7b(b), 1343, 1347, and 1349 and 21 U.S.C. §§ 841 and 846 involving **ABE SAAD** during the period of **January 5, 2021, through January 8, 2021, and January 27, 2021, through January 28, 2021**.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by T-Mobile USA Inc, and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of [**PROVIDER**].  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile, and they were made by T-Mobile as a regular practice; and

b.      such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by T-Mobile and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                             Signature

AUSA:   Claire Sobczak          Telephone:   (202) 591-5418
AO 93  (Rev. 11/13) Search and Seizure Warrant          Special Agent:   Michael Wakeley          Telephone:   (313) 919-1435

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Search of | ) | Case: 2:21-mc-50224 |
| *(Briefly describe the property to be searched* | ) | Judge: Lawson, David M. |
| *or identify the person by name and address)* | ) | Filed: 02-17-2021 At 09:29 AM |
| INFORMATION ASSOCIATED WITH THE | ) Case No. | IN RE: SEALED MATTER(SW)(MLW) |
| CELLULAR TELEPHONE ASSIGNED CALL | ) | |
| NUMBER 313-523-6789, THAT IS STORED AT | ) | |
| PREMISES CONTROLLED BY T-MOBILE | ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ New Jersey _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before   3/2/2021 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   February 17, 2021    9:19 am _____          _____
                                                                                              *Judge's signature*

City and state:     Detroit, Michigan _____          Hon. Anthony P. Patti     U. S. Magistrate Judge
                                                                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*